State *v.* Robinson.

STATE *v.* ROBINSON.

(*Nashville.* January 5, 1901.)

1. JURY TRIAL. *Opinion of juror does not disqualify, when.*

A juror is competent to sit on the trial of a felony case if he affirms that he can disregard a preconceived opinion and give the defendant a fair and impartial trial upon the law and the evidence, although he states, also, that he has formed and expressed a fixed opinion upon the question of the defendant's guilt, which he still entertains, and that it would require evidence to remove, when his opinion is based on newspaper and other like accounts of the transaction, which, though deemed reliable, did not purport or appear to be, and were not considered by him, as embodying the statements of witnesses or other person acquainted with the facts. (*Post, pp. 205–207.*)

Case cited: Woods *v.* State, 99 Tenn., 182.

2. SAME. *Swearing officer to attend jury.*

It is not reversible error for the trial Judge, at chambers, without the presence of defendant or his counsel or notice to them, to appoint and swear an additional officer, upon an emergency arising that required such action, to assist in keeping a felony jury in proper custody and in protecting them against outside interference. (*Post, 207–209.*)

3. SAME. *Improper conduct of District Attorney not cause for reversal of verdict, when.*

Although it is improper for the District Attorney to propose, in a felony case, to prove by parol, if no objection was made by defendant, that a witness, whose deposition defendant was offering to read, was under sentence of infamy, still such action on his part does not constitute reversible error where the Court ruled that it was improper and the District Attorney, upon objections by defendant, withdrew his statement and proposition. (*Post, pp. 209, 210.*)

State *v.* Robinson.

4. **MURDER.** *Facts that support verdict for murder in second degree.*

The facts set out in the opinion are held to support a verdict of murder in the second degree with sentence of fifteen years imprisonment. (*Post, pp. 210–216.*)

FROM WHITE.

·Appeal in error from Circuit Court of White County. W. T. SMITH, J.

Attorney-general PICKLE, SNODGRASS &· FANCHER and JARVIS & HILL for State.

L. D. SMITH, B. G. ADCOCK and SMITH & HUDSON for Robinson.

WILKES, J. Defendant is convicted of murder in the second degree and sentenced to fifteen years in the State prison, and has appealed.

The killing of Erb Willhite by defendant is admitted, and the contention on the merits is that it was ·done in self-defense, or, if this may not be sustained under the proof, that there was not such malice as would make the killing murder in the second degree, but that it was done in a sudden heat of passion provoked by a blow from the deceased.

The State insists, however, that there was ˏ an old grudge between the parties arising out of a

former difficulty with a brother of the defendant, and that the killing was malicious and unjustifiable.

The defendant has been ably defended and his cause has been elaborately presented by learned counsel, and several assignments of error are made, in addition to an oral argument on the facts and merits of the case.

It is objected that Howard Smith and J. R. Robbins, two of the jurors who tried the defendant, were incompetent to act as such. These gentlemen, on their *voir dire,* stated that they had formed and expressed an opinion as to the merits of the case and the guilt of the defendant; that this opinion was based upon information which they relied upon and believed to be true; that they had read the newspaper accounts of the killing, but that they did not know that those from whom they obtained their information knew or professed to know the circumstances of the case; that they had a fixed opinion based upon this information, which they regarded as true and reliable, and one which it would require proof to remove; that they could, however, try the case according to the law and evidence, and give the defendant a fair and impartial trial. The parties were held by the Court to be competent; were accepted by the State but challenged by the defense, and were placed on the jury over the protest of the defendant.

State *v.* Robinson.

The defendant exhausted all his challenges in making up the jury, and was forced to accept a juror over his peremptory challenge. This is assigned as error.

We are of opinion that under the ruling of this Court in *Woods* v. *The State,* 15 Pickle, 182, there was no error in accepting these parties as competent jurors. They could not say that the accounts which they had heard and read were given by persons who knew or professed to know the facts, and they stated that they could render a verdict impartially upon the evidence, notwithstanding these preconceived opinions, which were formed, as we think, from rumor and not from any account by any one purporting or assuming to know or state the facts. We think the statements they had read and heard of the facts must be treated as rumor and do not disqualify the persons from acting as jurors.

It is next assigned as error that after the jury had retired to consider of the verdict, and while the Court was not in session and in the night time, and in the absence of the defendant, and without his knowledge or consent, or that of his attorney, the trial Judge appointed one W. D. Passons to assist the officer in charge of the jury. He was sworn, and, in connection with the other officer, waited upon the jury. The bill of exceptions does not state the reason why this additional officer was selected and

State *v.* Robinson.

sworn. It appears, however, from an affidavit made on the motion for a new trial by the officer in charge originally, that one William Robinson had obtruded his presence on the jury on two or more occasions, and while it does not appear that he held any improper communication with the jury, yet some of the jurors thought his conduct was improper and asked the officer in charge to apply for another to assist him. The Judge was telephoned to about the matter, and went to the hotel where the jury was quartered and selected Passons and swore him in to assist the regular officer. Some three or four of the jury were sick and seemed to be alarmed at what was being given them to eat at the hotel.

We think there is no reversible error in this action of the trial Judge. He was on the ground and saw and knew all the circumstances, and must have been convinced that it was necessary, under the circumstances, to have an additional officer to handle the jury. There is no valid exception or objection made to the party selected to aid the regular officer, and it is not stated that he had any intercourse with the jury, but was merely assisting to wait upon them; an emergency having arisen in the night time for this additional officer, it is not reversible error in the trial Judge to make this provision without attempting to convene Court and have the jury,

defendant, and attorneys present when he made the appointment.

It is next objected that there was improper conduct on the part of the attorney for the State. The defendant offered to read the deposition of one Noa, when the District Attorney stated orally in open Court, in the presence of the jury, that the witness had been rendered infamous and had been sent to the penitentiary for stealing mules; that he did not have the record to establish the fact but that he had a witness who would prove it, and proposed to introduce and examine him if there was no objection, adding that he knew that it would be incompetent unless there was no objection, and asked counsel for defendant if he would object. The defendant's counsel objected, and thereupon the District Attorney withdrew his exception to the deposition, and it was read.

The trial Judge stated in open Court that the proposition of the District Attorney was improper. This statement and proposition of the District Attorney was improper, and should not have been made. While the record is meager as to what the Court stated, it does appear that the trial Judge said that it was improper and the District Attorney, upon objection, withdrew the statement and proposition, and the deposition was read without further exception. This was all that could be done to rectify the error, and we do not think it of such importance

22 P—14

State *v.* Robinson.

as to be reversible. Other objections were made to statements by the District Attorney, but we do not consider them of reversible importance. We are also of opinion that no sufficient ground for continuance was laid. The case had been pending for some time and had been twice tried. No special effort appears to have been made to get absent witnesses, and there was unnecessary delay in applying to have them attached. The evidence of the absent witnesses appears to be merely cumulative. There are other assignments which we do not deem material.

Coming to the merits of the case the defendant's version is that he and his father were returning to their home from Sparta, driving a wild team of horses in two-horse buggy; that they met the deceased and witness, Burgess, driving some calves in an opposite direction, and they were hallooing quite loudly, more so than was necessary to drive the cattle, but as if they were drunk. They met in a lane, and as the cattle came running along they frightened the horses and caused them to turn the buggy out of the road on the side and upon a bank, and threw him out. Defendant's father drove the buggy up the road about eight steps from where it turned over, and left the defendant standing at that place, where the deceased and Burgess came up and began cursing him; that he said to deceased that he wanted no fuss, and deceased

State *v.* Robinson.

called him a damned liar, when he replied he could take that from him; that he then started to get in his buggy, when deceased stepped between him and the buggy and called him a damned liar again, and he replied that he was another, and deceased then struck at him, but he warded off the blow to a considerable extent, so that he only hit his hat, but immediately struck him again in the eyes and knocked him down backward; that he caught on his hands; that deceased threw his hand into his pocket in front, and defendant then pulled his pistol and shot, firing at him four times. He thought deceased was trying to draw a knife or pistol, and he shot because he was afraid of being killed; that he begged him, when the quarrel first commenced, to get on his horse and go on, and that he wanted no difficulty, and had nothing against him; that deceased and Burgess came back to where defendant was; that after the shooting he got into the buggy with his father and went on home, about two and one-half miles, and stayed there until arrested; that his father told the deceased, when they were coming down the road driving the calves, to hold up, that he was scaring the horses, and that he replied that the road was free, to let them run.

Defendant and his father had some whisky in the buggy, and he had taken two or three drinks, but they were not drunk; that he was

occasionally in the habit of carrying a pistol, but did not wear it all the time; that deceased never told him during the difficulty that he had no pistol. The defendant states that he had shot at another person three times on a previous occasion, but that Williams, the other party, had shot at him, and that he had a fight up at a sawmill, but denied other difficulties about which he was questioned: that the next day after the shooting he went hunting in the mountains and stayed several days; and was arrested while going home just before day; that he got money and made arrangements to leave the country; that he was arrested about three months after the killing and had been dodging the officers, and that during the difficulty he had his hand on his hip, an attitude usual to him.

The testimony of the father is substantially the same as that of defendant. It appears that Combs, Burgess, and Will Jet were the only other eyewitnesses of the immediate difficulty. Both Jett and Burgess were with deceased when they met defendant and his father. Burgess' version is that as they passed the buggy defendant's father said something; that he helped to turn the horses and buggy back into the road, and while he was doing so defendant went down the road towards Willhite and took hold of the bridle of his horse and said: "You run over Charlie, but you can't run over me;" Willhite replied that he

did not run over Charley, and defendant called him a liar. Willhite replied he did not want any fuss; that defendant had his hand on his pistol. Willhite got off his horse and threw the reins over a bush at the side of the road and told defendant not to do anything to him, and defendant told him to get on his horse and go on home or he would blow his head off; that defendant had his hand under his coat, but whether in his hip pocket or not he could not tell. A few words passed, and defendant called Willhite a liar and son of a ——, and Willhite thereupon struck him in the face and knocked him back, and defendant drew his pistol and fired four times.

On cross-examination this witness confessed to many misdemeanors and crimes that he had committed, such as stealing watermelons and whisky, and causing disturbances at church, and stopping the mail, and that he had paid to get out of a great many scrapes—so many that he could not remember them; that he seduced his two cousins, and that he never stole anything he did not need; that he was a chum of the deceased and related by marriage; that Willhite was between the defendant and his buggy when he was shot, and that the defendant was not doing anything to deceased when he struck him, except calling him a liar and a son of a ——. In his re-examination the witness attempted, with poor

success, to explain his many escapades. He also stated that the deceased struck at defendant twice, but he thinks hit him only once, and staggered him back, but did not knock him down.

Will Jett, the other witness, was a negro, and testified to substantially the same state of facts as Burgess. He corroborates him in the statement that after defendant got out of the buggy he went on down the road to where deceased was, and that he took hold of his bridle reins and told deceased he could not run over him like he did over Charley; that deceased denied running over Charley, and got down off his horse, and defendant called him a damned liar, and told him to get on his horse and go home or he would blow his head off; that defendant had his hand under his coat all the time while talking to deceased; that deceased told him he was not armed and wanted no fuss; that when Willhite struck defendant he fired, but Willhite did not fall; that the first thing Willhite said in the trouble was that he had nothing against defendant and had nothing to fight him with; that after the trouble he went away from the county, at defendant's request and on his money; that Willhite was between the defendant and his buggy when the shooting occurred, and was doing nothing but talking and swearing.

The physician testified that Willhite was shot in the right side, about two inches below the

State *v.* Robinson.

right    nipple.    The    ball    ranged    downward    and
went    through    the    right    lung,    making    a    large
wound,    which    caused    the    death;    that    Willhite    was
not    under    the    influence    of    whisky    when    he    was
shot.

The  character  of  the  main  witnesses  is  severely
attacked,  and  it  must  be  confessed  that  they  do
not    well    stand    the    test,    especially    Burgess;    but
it  seems  the  jury  believed  them,  and  there  is  no
very  great  difference  between  their  statements  and
defendant's,    except    in    the    feature    that    they    say
the    deceased    told    defendant    he    was    not    armed,
and    that    the    defendant    advanced    upon    the    de-
ceased  by  going  down  the  road  to  him.

It  is  earnestly  insisted  the  facts  do  not  make
out  a  case  of  murder  in  the  second  degree,  but
at  best  only  manslaughter  done  in  a  heat  of  pas-
sion.    There    is    evidence    tending    to    show    some-
thing  of  a  grudge  by  defendant  against  deceased,
on  account  of  his  former  treatment  of  his  brother
Charley,  but  it  is  insisted  the  real  cause  of  the
killing  was  the  hot  blood  aroused  at  the  moment
by  the  blow  which  the  deceased  gave  the  de-
fendant  while  intercepting  him  from  his  buggy.

The  defendant  denies  that  he  made  any  refer-
ence  to  the  former  difficulty  with  Charley,  but
we  think  the  weight  of  the  evidence  is  that  he
did  refer  to  it.

There  are  other  features  in  the  case,  but  we
do  not  think  they  are  of  sufficient  importance

to pass on them specially. We think the weight of the evidence is that the defendant advanced upon the deceased in a threatening manner after he was thrown from the buggy, and cursed and abused him, and that he shot the deceased when he was in an upright position, and not on his knees; that deceased was unarmed and the defendant referred to the previous difficulty between deceased and his brother, showing an old grudge, and under these facts he is guilty as found by the jury, and the judgment is affirmed with costs.